CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review pursuant to N.J.S.A. 54:3-21 of the 1990 assessment on *340 its property located at 420 Willow Tree Road, Leonia, New Jersey (Block 21, Lot 20.06). The assessment was:
Land $ 614,300
Improvements 7,065,900
Total $7,680,200
At issue are the true value of the subject property, whether plaintiff is entitled to relief from a discriminatory assessment pursuant to N.J.S.A. 54:51A-6 (chapter 123) and whether certain items located in the building constitute real property pursuant to N.J.S.A. 54:4-1, as amended by A. 1986, c. 117.
The subject property is a two-story masonry and steel building constructed in 1982; it contains 60,000 square feet of floor area (30,000 square feet on each floor) and is sited on 3.512 acres of land.
The first floor, which has no windows, contains a computer room (10,000 square feet), mechanical service areas including electrical room, battery room, generator room, HVAC equipment room (10,000 square feet) and storage areas (10,000 square feet). The computer room has a removable 18" raised floor. The second floor consists of general office space.
The subject is leased in its entirety to Equitable Life Assurance Society (Equitable) pursuant to a ten-year renewable lease executed on December 30, 1983 to commence May 1,1984. The annual rental was $795,000.
The property is one of Equitable’s largest computer record centers where policyholder data is stored. The records are maintained through computers leased to Equitable by IBM, which replaces them from time to time with newer, state-of-the-art models.
The items in dispute in this proceeding consist of batteries, generators, a halón (fire detection and location) system, an uninterruptable power supply (UPS), pumps and chiller for chilled water (to maintain a constant temperature of 52° Fahrenheit for the computers), and interface cables housed beneath the raised floor.
*341 All the aforementioned items can be removed without injury to the building or to the items themselves. None of the items is physically attached to the building itself. The two generators, although of great bulk and weight, rest on concrete pedestals and can be taken apart and removed through louvered doors on the first floor.
All the items in dispute are intended exclusively for the support of the computers. The batteries, generators and UPS are all designed to maintain electrical power for the computers in the event of a power failure, which could cause a computer “crash,” i.e., loss of memory and eradication of records stored in the computers. The halón system is a dry-fire protection system; water would damage the computers. The cables and wires beneath the raised floor, along with the chilled water pumps, control the environment which the computers require. None of the items has any functional utility if the computers are removed.
On February 24, 1984, plaintiffs predecessor and Equitable entered into a lease modification agreement whereby plaintiffs predecessor undertook to install the items in dispute for a price (including overhead and profit), subsequently determined, to be paid by Equitable over 114 months commencing November 1, 1984. Provision was made for payment of the unamortized balance in the event of the lease’s early termination.
The cost of the items was called “fixture and construction cost” and Equitable’s reimbursement of the landlord for such cost was called “fixture and construction rent.”
In another lease modification agreement, entered into on January 18, 1985, plaintiff’s predecessor and Equitable agreed that the fixture and construction cost would be $5,088,000 and the fixture and construction rent would be $76,757.56 a month or $921,090.81 annually.
The agreement of February 24, 1984 contained the following provision:
2. All of the alterations, improvements and equipment including the UPS system and generator contemplated to be purchased by Landlord under this *342 Agreement, shall be and become the property of the Landlord and shall be considered a part of the building in which the demised premises are located.
Plaintiff purchased the property on January 24, 1985 for $13,917,088. The acquisition was financed with a $10 million wraparound first mortgage, a $2 million second mortgage with First Fidelity Bank and $1.9 million cash. At the time of the sale the Equitable lease and the modification agreements were in place.
The highest and best use of the subject property on the assessing date was its current use as commercial office space combined with light industrial or warehouse use.
Plaintiffs expert initially estimated the subject’s true value to be $3,532,700 on the assessing date. In arriving at this conclusion he employed both the cost and income approaches to value, placing principal reliance upon the latter. He also concluded that the generators, batteries, UPS system and all other machinery and equipment utilized in support of the computers on the premises were personal property and not taxable as part of the real property. He estimated the economic rent for the second floor to be $18 a square foot plus a dollar a square foot for tenant electric. He estimated economic rent for the first floor, where the computers are located and which has no windows, at $14.40 a square foot and the warehouse/storage area at $6 a square foot. He supported his conclusions regarding economic rent with 14 leases of office space for the second floor, two leases of finished basement space for the windowless first floor where the computers are located and three leases of industrial space for the warehouse/storage area.
He posited a 15% vacancy and loss allowance, predicated on survey reports prepared by Black’s Guide, Bender & Company and Coldwell Banker covering office building vacancies in Bergen, Essex, Hudson, Morris and Passaic Counties. All these reports indicated a composite vacancy rate at or around the valuation date of 14.5% for older, existing buildings and 71% on newer office buildings.
*343 The expert estimated expenses at $5.08 a square foot exclusive of management and reserves, to which he assigned rates of 5% and 3% of effective gross income, respectively. He based his conclusion on analyses of expenses incurred in the operation of four office buildings in Fort Lee, Teaneck and Wayne during the years 1986 through 1989.
He then capitalized net operating income of $428,516 at 11.88% to arrive at his final value estimate. The capitalization rate was composed of a blended rate of 10.43%, developed under the mortgage-equity technique and an effective tax rate of 1.45%, the result of a sophisticated allocation between space leased on a net basis and space leased on a gross basis, with recognition of the landlord’s obligation for the taxes on vacant space.
Defendant’s expert estimated the true value of the subject property to be $15,700,000 on the valuation date. In arriving at this conclusion he relied upon the income and sales approaches. The income approach consisted solely of a capitalization of the actual rent paid by Equitable, including the amortization of fixture and construction costs (which plaintiff’s predecessor and Equitable characterized in their lease agreements as rent) less an assumed 2% vacancy and 5% management and leasing expense. The net operating income thus calculated was $1,597,-680 ($795,000 stated annual rent plus $921,090 in fixture and construction rent less vacancy and loss allowance of $34,322 and management and leasing expense of $84,088), which he capitalized at 10.2%, utilizing the mortgage-equity technique. He assumed no effective tax rate as, in his judgment, the tenant paid the taxes.
The expert utilized no comparable leases; nor did he provide any statistical data in support of his vacancy allowance or his assumed management and leasing expense equal to 5% of effective gross income.
His sales comparison approach consisted only of the sale of the subject for $13,917,088 on January 24, 1985, which he *344 adjusted for time to arrive at a value under this approach of $15,310,000.
Both experts agreed on a capitalization rate of 10.43%, exclusive of the effective tax rate. This agreement caused a change in the experts’ value estimates. Plaintiff's expert increased his estimate to $3,608,600 from $3,532,700; defendant’s expert reduced his estimate from $15,700,000 to $15,325,500.
Defendant’s expert’s appraisal may be disposed of summarily. By his own admission, he valued the property owner’s interest in the income stream in perpetuity, ignoring the fact that the Equitable lease was for a fixed term. He did not even value the leased-fee estate, which is the sum of the present value of the leasehold income and the present value of the owner’s reversion at the end of the lease. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 111. He certainly did not value the fee-simple estate, which is the sum of all interests in the property. Indeed, during cross examination he professed ignorance of the difference between a leased-fee estate and an estate in fee simple.
His sales comparison approach fares no better, resting as it does solely on the sale of the subject property in 1985. That sale involved seller financing (the wraparound), a second mortgage and a cash investment of 13.67%. No details were disclosed concerning the terms and conditions of the mortgages. The sale is simply not probative of the property’s true value on the assessing date, which was nearly five years after the sale.
It will thus be seen from the foregoing that the presentation of defendant’s expert is of no assistance to the court in ascertaining the true value of the subject property on the valuation date. The probative utility of an expert’s opinion rests entirely on the facts and reasoning offered in support of it. Kearny Leasing Corp. v. Kearny, 6 N.J.Tax 363 (Tax Ct.1984), aff’d o.b. per curiam 7 N.J.Tax 665 (App.Div.1985); Evid.R. 56, Comment 7 (Anno.1991).
*345 This leaves the court with the appraisal and valuation testimony of plaintiffs expert as the only credible evidence of the property’s true value. Before the expert’s presentation is analyzed, however, the court must address the taxable status of the items in dispute, namely, the batteries, generators, chilling pumps, cables and wires and all other items supporting the IBM computers in the subject building and embraced by the fixture and construction costs enumerated in the lease modification agreement of February 24, 1984.
N.J.S.A. 54:4-1, as amended by L.1986, c. 117, provides, in pertinent part:
... Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
a. (l) The personal property so affixed can be removed or severed without material injury to the real property;
(2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
(3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property; or
b. The personal property so affixed is machinery, apparatus, or equipment which is neither functionally essential to a structure the personal property is within or to which the personal property is affixed nor constitutes a structure itself.
The taxpayer must establish that the property in question is removable without material injury either to the real property or to the removed property itself and that such property is not ordinarily intended to be permanently affixed; failure to establish both elements results in taxation as real property, unless the property fits the description in subsection b. See American Hydro Power Partners v. Clifton, 11 N.J.Tax 12 (Tax Ct.1990), aff’d in part and remanded 12 N.J.Tax 264 (App.Div.1991).
Plaintiff has established both elements in this case, that the property in question can be removed without material injury to itself or to the real property and that such property is not ordinarily intended to be permanently affixed to the building. Thus, the court need not address the application of subsection b.
*346 As indicated above, in the findings of fact, none of the items in question is physically attached to the building; the largest items are the generators and they rest on concrete pads. They can be disassembled and removed through louvered doors..
Nor are the items of the kind that are ordinarily intended to remain permanently. The sole purpose of all the disputed items is to support the computers which are leased by IBM to Equitable, which occupies the building under a ten-year lease. When Equitable leaves, the computers leave and the items in question no longer serve a useful function. To conclude that Equitable will renew its lease in 1994 or that another tenant with a need for a computerized record-keeping operation will be found is speculative at best.
To be sure, the lease modification agreement of February 24, 1984 specifically provides that the property in question is the landlord’s property and is considered part of the building. The intention of the lessor and lessee,[1] however, is not relevant. ■What matters is whether the property in dispute is of the kind that is ordinarily intended to remain permanently. NYT Cable TV v. Audubon Boro., 9 N.J.Tax 359 (Tax Ct.1987), aff’d 230 N.J.Super. 530, 553 A.2d 1368 (App.Div.1989), certif. den. 117 N.J. 646, 569 A.2d 1344 (1989); Chevron U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 205 (Tax Ct.1987). For the reasons stated above, the court concludes that it is not.
The value estimate proffered by plaintiff’s expert is amply supported by the copious data submitted relative to economic rent, vacancy allowance and expenses. The court is impressed not only with the expert’s intelligence and knowledge but also with the facts and reasoning which form the foundation of his opinion. Apex Trucking v. Secaucus, 1 N.J.Tax 417 (Tax Ct.1980).
Accordingly, the court finds the true value of the subject property to be $3,608,600 on October 1, 1989.
*347 The general average ratio duly promulgated by the Director, Division of Taxation for defendant taxing district for tax year 1990 was 51.01%. As the assessment exceeds the subject property’s true value as herein found plaintiff is entitled to assessment relief by application of the average ratio to such true value. N.J.S.A. 54:51A-6(b).
Thus, the 1990 assessment will be:
Land $ 614,300
Improvements 1,226,400
Total $1,840,700
Judgment will be entered accordingly.

Nor does it matter that the property in question may have been included as part of the mortgage when plaintiff’s predecessor acquired title.